# UNITED STATES DISTRICT COURT

for the

Northern District of Oklahoma

*FILED*

AUG 9 2018

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.  18-MJ-99-PJC |
| | ) | |
| 5998 SOUTH 632 ROAD | ) | |
| QUAPAW, OKLAHOMA 74363 | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment "A":

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 16 U.S. Code § 703 | Taking, killing, or possessing migratory birds unlawful |
| 16 U.S. Code § 668a | Taking and using of the bald and golden eagle for scientific, exhibition, and religious purposes |
| 16 U.S. Code § 3371 | Control of Illegally Taken Wildlife |

The application is based on these facts:

**See Affidavit of Matthew M. Bryant, attached hereto.**

☒ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Matthew M. Bryant, USFWS Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/9/2018

_____
*Judge's signature*

City and state:  Tulsa, OK

U.S. Magistrate Paul J. Cleary
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Matthew Bryant, the Affiant, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     The Affiant makes this affidavit in support of an application for a search warrant for the residence and property, to include any outbuildings or structures (hereinafter "SUBJECT PREMISES"), of Gene ORTNER  (hereinafter ORTNER), located at 5998 South 632 Road, Quapaw, Oklahoma 74363 (further described in Attachment "A" incorporated herein).

2.     The Affiant is a Special Agent (SA) with the U.S. Fish & Wildlife Service, Office of Law Enforcement (USFWS/OLE), stationed in the Edmond, Oklahoma field office.  The Affiant has been employed as a Special Agent with the USFWS/OLE for approximately seventeen years.  Prior to assuming a position as a Special Agent, the Affiant was employed as a uniformed Federal Wildlife Officer for the USFWS, Division of National Wildlife Refuges, and was so employed for approximately seven years.  During his tenure with the USFWS, the Affiant has received formal training and gained experience in criminal investigations as well as extensive training on wildlife identification.  As both a Federal Wildlife Officer and a Special Agent, the Affiant has been involved in numerous investigations regarding the illegal taking, transportation, and/or sale of wildlife, to include migratory birds and their feathers. Through his training and experience, the Affiant is familiar with the methods commonly used by individuals and entities to unlawfully take, sell, transport, conceal and store, illegally-taken wildlife and wildlife parts. Many of these investigations involved the unlawful killing, transport, possession, and sale of bald eagles, golden eagles, and other migratory birds and their parts. The Affiant has prepared many affidavits to support probable cause for search warrants, seizure warrants, arrest

warrants, and criminal complaints, and has been an affiant on many of those affidavits. Furthermore, the Affiant is a federal law enforcement officer authorized to execute search warrants under Rule 41(a) of the Federal Rules of Criminal Procedure as well as under Title 16, United States Code, Sections 668b, 706, and 3375(b).

3. The information in this affidavit is based on the Affiant's participation in this investigation, review of various documents, and information from other law enforcement officers. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Unless otherwise indicated, statements attributed to individuals in the affidavit are set forth in sum, substance, and in part.

## PROBABLE CAUSE

4. As set forth herein, there is probable cause to believe that evidence of the unlawful take, sale, purchase, receipt, possession, and transport in interstate commerce, of bald eagle and golden eagle carcasses/parts (*Haliaeetus leucocephalus and Aquila chrysaetos,* respectively) will be found at the SUBJECT PREMISES, (further described in Attachment "A" incorporated herein). Specifically, there is probable cause to believe that evidence of violations of the Migratory Bird Treaty Act, Bald and Golden Eagle Protection Act and the Lacey Act, will be found at SUBJECT PREMISES (further described in Attachment "A" incorporated herein).

5. Bald eagles are the national symbol of the United States and they are widely considered sacred by American Indians. Federal law limits possession of eagle feathers and other parts to enrolled members of federally recognized tribes who use them in religious practices. Bald eagles once nearly disappeared from most of the United States but flourished under federal

protections and came off the endangered list in 2007. Hunting them generally remains illegal.
The USFWS operates the National Eagle Repository to provide Native Americans with eagle
carcasses, parts and feathers. Native Americans can also inherit them within their families or
receive them as gifts. Typically, eagle feathers are kept within families and extended families for
generations.

6. There is a high demand for eagle parts such as wings, head, feet and feathers and
they are often illegally sold on the black market, where a single eagle feather can be worth $500.
Tail feathers are often specifically sought after and names such as "black tip" (immature golden
eagle), "speckled" (immature bald eagle), "whites" (mature bald eagle) and "striped" (mature
golden eagle) are used to identify tail feathers of eagles. The feathers of golden and bald eagles
are sacred to American Indians as symbols of God and the values the people hold toward nature
and humanity. The demand and use of eagle parts greatly lies with Native Americans, who
fashion them into regalia or they are used in other cultural and religious practices.

## RELEVANT WILDLIFE STATUTES

### The Migratory Bird Treaty Act

7. The Migratory Bird Treaty Act (Title 16, United States Code, Sections 703—712)
states, in part, that it shall be unlawful at any time, by any means or in any manner, to pursue,
hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter,
barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped,
exported, or imported, deliver for transportation, transport or cause to be transported, carry or
cause to be carried, or receive for shipment, transportation, carriage, or export, any migratory bird,
any part, nest, or egg of any such bird, or any product, whether or not manufactured, which
consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof, except

as allowed by regulation. A list of migratory birds, which includes the bald eagle (*haliaeetus leucocephalus*) and the golden eagle (*Aquila chrysaetos*), is found in Title 50, Code of Federal Regulations (CFR), Part 10.13. Regulations governing permits to possess migratory birds are found in Title 50 CFR Part 13 and Title 50 CFR Part 21.

### Bald and Golden Eagle Protection Act

8.     The Bald and Golden Eagle Protection Act (Title 16, United States Code, Sections 668–668c) states, in part, that it is unlawful for anyone to knowingly or with wanton disregard for the consequences of his act, to take, possess, sell, purchase, barter, offer to sell, purchase, or barter, or transport at any time or in any manner any bald eagle or golden eagle, alive or dead, or any part, nest or egg thereof, except as allowed by regulation. Regulations governing permits to take or possess eagles are found in Title 50 CFR Part 13 and Title 50 CFR Part 22. The Bald and Golden Eagle Protection Act defines "take" as pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb and defines "transport" as ship, convey, carry, or transport by any means whatever, and deliver or receive or cause to be delivered or received for such shipment, conveyance, carriage, or transportation.

### The Lacey Act

9.     The Lacey Act, (Title 16, United States Code, Section 3371 et. seq.) regulates the interstate trafficking of illegal wildlife. Section 3372(a)(1) of the Lacey Act states that it is unlawful for any person to import, export, transport, sell, receive, acquire, or purchase any fish, wildlife or plant taken, possessed, transported, or sold in violation of any law, treaty, or regulation of the United States or in violation of any Indian Tribal Law. Pursuant to the Lacey Act, the term "fish or wildlife" means any wild animal, whether alive or dead, whether or not bred, hatched, or born in captivity, and includes any part, product, egg or offspring thereof. The Lacey Act defines "transport" as move, convey, carry, or ship by any means, or to deliver or receive for the purpose of movement, conveyance, carriage, or shipment. Section 3372 (a)(2)(A) of the Lacey Act

provides that it is unlawful for any person to import, export, transport, sell, receive, acquire, or purchase in interstate of foreign commerce any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State. The State of Oklahoma prohibits the taking of bald and golden eagles and the sale of eagles/eagle parts.

10.     The Lacey Act makes it a felony to knowingly engage in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350, knowing that the fish or wildlife or plants were taken, possessed, transported, or sold in violation of, or in a manner unlawful under, any underlying law, treaty or regulation of the United States.

## Oklahoma State Law

### Title 29 of the Oklahoma Statutes Citationized; Game and Fish

11.     Oklahoma Statute (O.S.) Title 29 Section 4-112.A. - Except as otherwise provided for in the Oklahoma Wildlife Conservation Code or the Oklahoma Farmed Cervidae Act, no person may hunt, pursue, trap, harass, catch, kill, take or attempt to take in any manner, use, have in possession, sell, or transport all or any portion of any wildlife except fish, without having first procured a license from the Department of Wildlife Conservation.

12.     O.S. Title 29 Section 7-502.D. - It shall be unlawful for any person to have in their possession any meat, head, hide, or any part of the carcass of any wildlife not legally taken.

13.     O.S. Title 29 Section 7-503.A. - Except as otherwise provided for by law, no person may buy, barter, trade, sell or offer, or expose for sale all or any part of any fish or wildlife or the nest or eggs of any bird, protected by law.

14.     O.S. Title 29 Section 2-149.1 - "Wildlife" means all wild birds, mammals, fish, reptiles, amphibians and other wild aquatic forms, and all other animals which normally can be found in the wild state, regardless of classification, whether resident, migratory or imported,

protected or unprotected, dead or alive, and shall extend to and include any and every part of any individual species of wildlife, whether or not bred, hatched, or born in captivity, and including any part, product, egg, or offspring thereof.

15.     O.S. Title 29 Section 2-143 - Transport. "Transport" is the carrying or moving by any means, causing to be carried or moved by any means, or accepting and receiving wildlife for such carrying or movement.

## BACKGROUND OF INVESTIGATION

16.     On April 27, 2018 there was a report made at the Wyandotte High School that alleged a juvenile student, referred to in this affidavit as "S.W.", had been having sexual relations with an adult male identified as Carl Gene ORTNER.

17.     On April 28, 2018 Ottawa County Sheriff's Department Detective Leslie Bissell met with S.W. at the Wyandotte Nation Tribal Complex.  S.W. advised she had been having sexual relations with ORTNER for approximately one year. ORTNER claimed to be a Native American Spiritual Counselor and Healer. ORTNER informed S.W.'s mother and father that he could help the family spiritually.  S.W.'s mother, Rebecca Wright, informed Detective Bissell that ORTNER became close to S.W. after the death of Wright's older daughter (Rachel). ORTNER informed Wright and her husband to focus on themselves and to let him help S.W. through her grieving process (grieving was related to death of S.W.'s older sister).  Detective Bissell learned that in the spring of 2016, ORTNER gave S.W. eagle feathers, which was very symbolic to their Native American Culture, and after this the sexual abuse began occurring. S.W. advised the first time she had sex with ORTNER she was 15 years of age and it was around

Thanksgiving in November 2017. S.W. reported she did not want to have sex with ORTNER at that time or during the occasions that followed. S.W. informed Detective Bissell she had sex with ORTNER because he put pressure on her and represented himself as a spiritual healer. S.W. elaborated the sexual contact was unwanted but ORTNER told her she must do it because she had been instructed to do so by her elder (ORTNER) and that she must always respect her elders. S.W. reported that ORNTER would take her in the "sweatbox" to have sex with him and he described it as something she needed to do to further her spiritual awareness.

18.     On June 5, 2018, Oklahoma Department of Conservation (ODWC) Game Warden (GW) Jason Adair was contacted by an individual who wanted to remain anonymous but identified himself as the Uncle to S.W. (hereinafter referred to as the Uncle). According to GW Adair, the Uncle stated he had information to report but was hesitant to talk at that time and seemed unsure if he wanted to report the information he had.

19.     On June 11, 2018, the Uncle contacted GW Adair again and said he had information regarding ORTNER having sexual relations with a fifteen year old girl from the Wyandotte, Oklahoma area. The Uncle informed GW Adair that ORTNER used eagle feathers and plumes as a barter for sexual relations.

20.     GW Adair asked the Uncle if ORTNER was a Native American from a federally recognized tribe. The Uncle informed GW Adair that ORTNER claims to be Native American. The Uncle stated ORTNER attends Gourd Dances around Oklahoma and in several northern states. The Uncle elaborated that ORTNER trades, sells and purchases eagle feathers but the Uncle did not know where he got them, only stating he heard from "up north". The Uncle stated

ORTNER had bragged to him that some of the eagles and eagle parts he possessed had been shot by poachers. The Uncle also stated that S.W.'s mother wanted to speak with GW Adair.

21.     On June 19, 2018, GW Adair coordinated with Bureau of Indian Affairs (BIA) Miami Agency, Chief of Police, Mike Mullins. Chief Mullins queried the BIA database for tribal enrollment and determined ORTNER was not listed as a member of any federally recognized tribe.

22.     On July 24, 2018, GW Adair contacted Detective Bissell and inquired if her investigation revealed any information of other eagle feathers or articles at ORTNER's residence. Detective Bissell advised ORTNER's niece and S.W. both state ORTNER has eagle parts at his residence, specifically eagle feathers in the attic and a whole eagle carcass in the freezer. Detective Bissell also informed GW Adair that she had learned ORTNER purchases, sells and trades eagle parts through social media (Facebook) and ORTNER has an additional cell phone at his residence that has information and pictures on it. Detective Bissell advised they had seized another cell phone ORTNER had in his possession during the arrest and it contained some information that may assist in the ODWC investigation. Detective Bissell also stated that another victim had come forward with information regarding ORTNER.

23.     On July 24, 2018, the Affiant checked the Facebook account of ORTNER, which was open to public view. Your Affiant noted numerous photographs of ORTNER with Native American regalia adorned with eagle feathers.



Other photographs depicted ORTNER at pow wows and a photograph posted by ORTNER on July 1, 2017, depicts ORTNER with a juvenile female in Native American regalia adorned with eagle feathers. ORTNER posted the following comment with the photograph of the juvenile female, "My niece Candace ready for Quapaw Pow Wow. She's wearing her "Big Girl" feathers I gave her tonight".

24.     On July 24, 2018, your Affiant checked the USFWS Service Permit Issuance and Tracking System (SPITS) database and did not find any information listing ORTNER as a permittee for eagle feathers or other migratory bird feathers.  Your Affiant also checked the USFWS Law Enforcement Management and Information System (LEMIS) database and it did not reveal any records indicating ORTNER was permitted to possess migratory birds.  Your Affiant subsequently contacted USFWS employee Dennis Wiist, located at the National Eagle Repository.  Wiist conducted further searches and did not find any documents or files indicating ORTNER had applied for eagle carcasses or parts.

25.     On June 26, 2018, GW Adair contacted Rebecca Wright (mother of S.W.). Wright stated the Ottawa County Sheriff's Department had taken a report from her regarding the alleged sexual relationship between S.W. and ORTNER. Wright informed GW Adair that S.W. possessed eagle feathers which were given to her by ORTNER but the feathers had since been buried in a ceremonial practice to rid them of the disgrace. GW Adair asked if Wright would prepare a written statement and she stated she would.

26.     On July 12, 2018, GW Adair was contacted by Wright who informed him that ORTNER had been arrested for statutory rape and was held in the Ottawa County jail. (ORTNER remains in Ottawa County jail as of the date of this affidavit) Wright stated ORTNER is employed at Lamar Advertising in Joplin, Missouri and may have eagle feathers and other articles at his office.

27.     On July 28, 2018, GW Adair received a sworn affidavit from Wright. Wright stated ORTNER first made himself known to them in 2015 when he gifted an eagle plume and drop set to S.W. *(Agent's Note: Plume's are often gifted to women who have done something honorable or for a specific event and are usually gifted after the event. A gifted plume is considered a high honor when received from an elder. A drop set means a group of feathers from a single bird, usually tail or primary wing feathers, and these feathers are used as a fan or other regalia.)* They interacted with ORTNER again in 2016, and ORTNER made the comment to Wright that, "It's time she [S.W.] had some big girl feathers".

28.     Wright stated they had seen ORTNER at several tribal events around Ottawa County and at pow wows in Ottawa County. Wright explained that ORTNER had his own drum and he had his own large Oklahoma fancy bustle full of eagle feathers. Wright stated she

thought ORTNER was, by all accounts, a respected "Native man." Wright stated ORTNER told her he was Cherokee but told her husband he was Pawnee.

29.     ORTNER gifted a mature bald eagle plume set with matching drop feathers to S.W. approximately one and a half to two years ago because she was, "a good fancy shawl dancer" and he wanted to "help encourage her to keep up with her culture". Wright stated this was seen as "a very great honor to S.W., as we know what the eagle feather means and it's place in our Native American culture." ORTNER gained the trust of Wright and S.W. through these gifts as Wright believed ORTNER to be a mentor and elder.

30.     During September 2017, S.W. was chosen as the Wyandotte Nation Princess. ORTNER started to re-engage with Wright and her family and presented himself as a "Native Elder" and "a grief counselor through our Native Ways". Wright stated her family was grieving the death of her oldest daughter (Rachel) and the Wyandotte Pow Wow in September 2017 was especially hard on the family. Wright stated she has a young son who also wanted feathers and ORTNER offered to, "help us dress him right as a straight dancer" and to "have the right eagle feathers in his roach and drop". ORTNER told Wright that he had plenty of eagle feathers and would assist anyway he could.

31.     During October thru December 2017, ORTNER began to spend more time with S.W. and Wright stated they allowed this because they believed ORTNER was helping S.W. with grief. Wright stated she believed S.W. was also there to "learn feather-work" and "how to make bustles". Wright stated that while at ORTNER's residence, she observed three (3) clear totes with white lids that contained numerous eagle feathers and described the feathers as "speckled", "immature ones", "mature", "balds". Wright stated some of the eagle feathers were cleaned and trimmed, with all the fluff and plumes, and laid in the totes neatly. Wright stated

ORTNER showed the feathers to her when she went to ORTNER's residence to pick up S.W. in November 2017. Wright advised that her husband and S.W. were also aware of two freezer's in ORTNER's garage and knew the freezers contained eagle claws, eagle heads and more eagle feathers.

32.     During November 2017, ORTNER took S.W. with him to a residence in Oswego (possibly Kansas) to "help cleanse a woman's house" by using eagle feathers and cedar. ORTNER presented himself as a Native elder to S.W. and gave her eagle feathers and let her be around all the eagle feathers and parts he possessed. Wright stated she knew S.W. was confused and depressed but they all thought it was due to the grief from the death of S.W.'s sister. Wright stated ORTNER had S.W. afraid of "evil spirits" and gave her a "smudging eagle feather" in December 2017 to "ward off the spirits he was keeping away from her" and also to "tell her sister to go away for a while because her spirit was making her [S.W.] too sad". Wright stated ORTNER did not just fool her family but many tribal leaders. Many other Native people in the area accepted ORTNER and thought he was what he said he was. Wright elaborated that neither she nor her husband were aware of ORTNER's comments and tactics towards S.W.

33.     Wright stated that in March 2018, S.W. turned sixteen. ORTNER told S.W. it was time for her to begin receiving more eagle feathers and began helping her make a new fancy shawl outfit that ORTNER described as "more noticeable". Also during March 2018, ORTNER brought over three eagle feathers for Wright's juvenile son to use in his regalia.

34.     Wright stated that in April 2018, they became aware ORTNER had been sexually assaulting S.W. Wright stated ORTNER was using S.W.'s grief and more importantly, her Native belief and spirituality, against her. ORTNER "guilted" S.W. on many occasions

throughout the months he sexually assaulted and abused her. ORTNER made statements such as, "haven't your parents been through enough", "if you ever tell, I will deny it like I have done before" and "if I go down, I will take you down and the tribe with me", Wright stated she had become aware ORTNER kept a hand gun by S.W.'s ankle on occasions when he assaulted her in the car and made sure she knew he had guns in his home to threaten her.

35.     On August 2, 2018, the Affiant contacted Detective Bissell. Detective Bissell stated other juvenile females had recently come forward with information regarding ORTNER and the statutory rape investigation. Detective Bissell advised the other juveniles had also mentioned ORTNER keeps eagle feathers and carcasses at his residence. Detective Bissell stated she had observed several Facebook Instant Messenger conversations while reviewing evidence from the forensic analysis of ORTNER's cell phone. Many of the conversations included photographs of feathers and regalia adorned feathers and involved communication regarding the transfer of feathers. Detective Bissell elaborated that ORTNER has another cell phone, an IPad and a computer at his residence. Detective Bissell stated it appeared the cell phone they seized during ORTNER's arrest had only been used for a couple of months.

## BACKGROUND ON COMPUTERS, THE INTERNET AND EMAIL

36.     The term "computer" as used herein is defined in Title 18, United States Code, Section 1030(c)(l) and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

37.     The Affiant has training and experience in the investigation of computer-related crimes. Based on this training and experience, as well as that of other law enforcement with whom your Affiant has communicated, your Affiant knows that:

a.      The Internet is a worldwide network of computer systems operated by governmental entities, corporations and universities. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The World Wide Web ("www") is a functionality of the Internet, which allows users of the Internet to share information;

b.      With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods.

c.      Email is a popular form of transmitting messages and files in an electronic environment between computer users. In today's world it often takes the place of phone conversations. When an individual computer user sends email, it is initiated at the user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An email server may allow users to post and read messages and to communicate via electronic means.

## INFORMATION REGARDING ITEMS TO BE SEIZED

38.     As set forth in Attachment B, your Affiant respectfully submits that there is probable cause to believe that the following items, which constitute evidence, fruits, and instrumentalities of violations of the Migratory Bird Treaty Act, Bald and Golden Eagle Act and the Lacey Act will be found at SUBJECT PREMISES:

a. All protected wildlife, to include carcasses and parts, along with associated regalia to which any protected wildlife may be affixed.

b. Indicia of ownership or business occupation of SUBJECT PREMISES including keys, utility bills, rental agreements, leases and mortgages; and

c. Records, including paper records, digital records, and electronic storage media on which digital records may be stored, relating to the importation, exportation, transportation, collection, acquisition, take, storage, possession, sale, purchase or trade, or offer for sale or trade in interstate or foreign commerce of wildlife, such as general ledgers, digital correspondence (private messaging, texts, emails, etc.) subsidiary ledgers, invoices, purchase orders, bills of lading, carrier records, airway bills, financial records, letters of credit, importation/exportation permits, customs entry forms, packing slips, purchase orders, contracts, importation documents, importation log books, receipts, shipping records, local, state or federal wildlife permits, cancelled checks, check book ledgers, bank statements, credit card statements, personal telephone directories (including digital contact directories), diaries, invoices, letters, correspondence, photographs, film, notes, reference material, and records of wildlife-handling practices.

39. Based on the Affiant's training and experience and that of other USFWS/OLE SAs with whom your Affiant has spoken, the Affiant is aware that persons who unlawfully smuggle or traffic in wildlife typically maintain and store various records (including paper documents and electronic files) detailing the ordering, payment for, receipt, storage, acquisition, and disposition of such wildlife, including the following:

a. Records (including digital records) which relate to the unlawful taking, acquisition, obtaining, possession, transfer, shipment, transportation, trade, sale, purchase storage or disposition of wildlife, including but not limited to, memo books, notebooks, notes, books, records, invoices, receipts, notes, bills of sale, air waybills, bills of lading, customs documents,

customer lists, price lists, contact lists with phone numbers, correspondence, shipping records, packing slips, and facsimiles.

b.      Financial records and accounting records, which relate to the unlawful taking, acquisition, possession, transfer, shipment, transportation, trade, sale, purchase or disposition of wildlife or the disposition of funds related thereto including, but not limited to ledgers, checks, bank and checking account statements, credit card receipts and records, money drafts, letters of credit, money orders and receipts, international bank transfer documents, bank drafts, cashier checks, bank checks, and safe deposit box keys.

c.      Records and/or documents of mailing, shipping or delivery of illegal wildlife, including but not limited to, receipts, invoices, and/or packing lists.

d.      Records and/or documents reflecting communications with government agencies, consumer associations, and/or business associations related to the acquisition, purchase, possession or sale of wildlife, including but not limited to documents or permits regarding compliance or non-compliance with governmental rules and regulations.

e.      Photographs (including digital photographs), negatives, video tapes, films, slides of potentially unlawfully acquired wildlife or potential assets associated with the acquisition and disposition of wildlife; undeveloped film which potentially contains images of the same.

f.      Diaries, calendars, appointment books, journals, address/telephone books (including an address/telephone rolodex or similar index), and business cards which reflect communications with or the identities of other wildlife traffickers.

40.     Affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct ways: (1) the objects themselves may be contraband, evidence, instrumentalities, or fruits of crime, and/or (2) the objects may be used as

storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, and electronic files that are evidence of crime, contraband, instrumentalities of crime, and/or fruits of crime.

41.    Affiant is aware that computers (including cellular "smart" phones) are used to engage in business transactions that involve the trade of wildlife species. A computer may have been used to store, generate, and print documents used in furtherance of the commercial trade, acquisition, and/or transfer of state protected reptiles, including box turtles, which were in violation of the laws enumerated hereinabove.

42.    Based upon your Affiant's knowledge, training and experience, Affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

(1) The volume of evidence. Computer storage devices (like hard drives, floppy disks, compact disks, "thumb drives" and removable media from cellular telephones and personal digital assistants) can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it could be impractical and invasive to attempt this kind of data search on-site.

(2) Technical Requirements. Searching computer systems and cellular phones for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer

experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Furthermore, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

43.    In light of these concerns, your Affiant hereby requests the Court's permission to seize the mobile phone(s)/smart phone(s) and computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene or if qualified digital evidence recovery personnel are not available, the agents executing the search conclude that it would be impractical to retrieve a duplicate image onsite

44.    Affiant has requested the assistance of computer forensics Analysts in the execution of this search warrant, specifically for the seizure of mobile phone/smart phone and computer criminal evidence. The computer hardware and associated electronic files will be removed from SUBJECT PREMISES to accurately retrieve the system data. All seized computer hardware will then be returned to the SUBJECT PREMISES within a reasonable amount of time. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drives) and any application software which may have been used to create the data (whether stored on hard drives or on external media).

45.     Based on your Affiant's knowledge of computers and also on information derived from forensic computer specialists, property search retrieval, analysis, documentation and authentication of all such electronically stored computer data requires onsite and/or offsite controlled environment analysis by a qualified computer specialist to prevent the loss of data either from accidental or deliberate programmed destruction. Data and information stored in an electronic format may be found not only on the hard disk drive of a computer, but on other computer equipment and related peripherals, including back-up tapes, floppy disks, and other devices capable of storing information in an electronic format. The evidence contained in the computer will be retrieved by duplicating the computer's hard drive. The duplicated hard drive will be seized as evidence and taken to a laboratory or other controlled environment where a search will be conducted by experienced computer technicians to extract only that information pertinent to the investigation and the alleged violations.

46.     Searching computer systems for the evidence described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a search warrant.  Similarly, agents may be able to locate the materials covered in the search warrant by looking for particular directory or file names.  In other cases, however, such techniques may not yield the evidence described in the search warrant.  Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its

contents briefly to determine whether it falls within the scope of the search warrant. In light of these difficulties, your Affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

47.     Based on Affiant's knowledge, training, and experience, your Affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## CONCLUSION

48.     Based on the above facts, there is probable cause to believe that evidence of the unlawful trafficking of wildlife in interstate commerce; and evidence of the unlawful take, possession, transport, sale and purchase of those items, in violation of the Migratory Bird Treaty Act, Bald and Golden Eagle Act and the Lacey Act, will be found at SUBJECT PREMISES (further described in Attachment "A" incorporated herein).  Thus, Affiant requests that the Court authorize a warrant to search SUBJECT PREMISES and seize evidence (further described in Attachment "B" incorporated herein).

Respectfully submitted,

Matthew M. Bryant
Special Agent
United States Fish and Wildlife Service

Subscribed and sworn to before me on this 9th day of August, 2018

Paul J. Cleary
United States Magistrate Judge

## ATTACHMENT A

The residence (5998 South 632 Road, Quapaw, Oklahoma), is a tan stucco residence with white garage door, white molding and guttering and has a brown shingle roof. The residence faces west. An extended front entryway, with large stucco columns, provides access to the front door. A wooden privacy fence extends to the north and south of the residence, and back to the east behind the residence. The residence is located on the east side of South 632 Road, at the intersection of East 60 Road.





**ATTACHMENT B**

**LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED**

1.     Any protected migratory birds, listed in 50 C.F.R. 10.13, and their feathers, parts, or products which are evidence of criminal violations of the Migratory Bird Treaty Act, Title 16, United States Code, Sections 703-712; the Bald and Golden Eagle Protection Act, Title 16, United States Code, Sections 668-668c; or the Lacey Act, Title 16, United States Code, Sections 3371 et. seq.

2.     Any digital camera and computer or electronic media that were or may have been used as a means to offer for sale and sell protected migratory birds and their feathers, parts, and products over the internet, including its peripherals, the software to operate the system, and the related instruction manuals which contain instructions concerning the operation of the computer system and software programs.

3.     Indicia of ownership or business occupation of SUBJECT PREMISES including keys, utility bills, rental agreements, leases and mortgages; and

4.     Records, including paper and digital records (to include electronic storage media on which digital records may be stored) relating to the importation, exportation, transportation, collection, acquisition, take, storage, possession, sale, purchase or trade, or offer for sale or trade in interstate or foreign commerce of wildlife, such as general ledgers, digital correspondence (private messaging, texts, emails, etc.) subsidiary ledgers, invoices, purchase orders, bills of lading, carrier records, airway bills, financial records, letters of credit, importation/exportation permits, customs entry forms, packing slips, purchase orders, contracts, importation documents, importation log books, receipts, shipping records, local, state or federal wildlife permits, cancelled checks, check book ledgers, bank statements,

credit card statements, personal telephone directories (including digital contact directories), diaries, invoices, letters, correspondence, photographs, film, notes, reference material, and records of wildlife handling practices.

5.     Records (including digital records) which relate to the unlawful taking, acquisition, obtaining, possession, transfer, shipment, transportation, trade, sale, purchase storage or disposition of wildlife, including but not limited to, memo books, notebooks, notes, books, records, invoices, receipts, notes, bills of sale, air waybills, bills of lading, customs documents, customer lists, price lists, contact lists with phone numbers, correspondence, shipping records, packing slips, and facsimiles.

6.     Financial records and accounting records, which relate to the unlawful taking, acquisition, possession, transfer, shipment, transportation, trade, sale, purchase or disposition of wildlife or the disposition of funds related thereto including, but not limited to ledgers, checks, bank and checking account statements, credit card receipts and records, money drafts, letters of credit, money orders and receipts, international bank transfer documents, bank drafts, cashier checks, bank checks, and safe deposit box keys.

7.     Records and/or documents of mailing, shipping or delivery of illegal wildlife, including but not limited to, receipts, invoices, and/or packing lists.

8.     Records and/or documents reflecting communications with government agencies, consumer associations, and/or business associations related to the acquisition, purchase, possession or sale of wildlife, including but not limited to documents or permits regarding compliance or non-compliance with governmental rules and regulations.

9. Photographs (including digital photographs), negatives, video tapes, films, slides of potentially unlawfully acquired wildlife or potential assets associated with the acquisition and disposition of wildlife; undeveloped film which potentially contains images of the same.

10. Diaries, calendars, appointment books, journals, address/telephone books (including an address/telephone rolodex or similar index), and business cards which reflect communications with or the identities of other wildlife traffickers.